UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ROCKINGHAM COUNTY NURSING HOME, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 11-11057-JGD |
| RANDOLPH HARNOIS, AS TRUSTEE OF THE HARNOIS IRREVOCABLE TRUST, | ) ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OF DECISION AND ORDER
ON DEFENDANT'S MOTION FOR LEAVE TO AMEND
AND ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

January 10, 2014

DEIN, U.S.M.J.

## I.  INTRODUCTION

The plaintiff, Rockingham County Nursing Home ("Rockingham"), has brought this action against Randolph Harnois, as Trustee of the Harnois Irrevocable Trust, in order to recover the cost of providing continuous nursing home care to the defendant's mother, Beatrice Harnois, from April 2009 until her death in September 2013.  It is undisputed that in July 2006, nearly three years before Ms. Harnois entered the nursing home, she transferred her primary residence ("Property") and only significant asset to the Harnois Irrevocable Trust ("Trust") for the benefit of her children and grandchildren.  By its Verified Complaint, Rockingham claims, in Count I, that the conveyance of the

Property to the Trust constituted a fraudulent transfer pursuant to Mass. Gen. Laws ch. 109A, § 5 because it was made with actual intent to hinder and/or delay Ms. Harnois' future creditors, or on the grounds of constructive fraud because Ms. Harnois did not receive reasonably equivalent value for the transfer and it occurred at a time when Ms. Harnois believed or reasonably should have believed that she would incur debts beyond her ability to pay as they became due.  Accordingly, the plaintiff is seeking an order setting aside the transfer and directing the sale of the Property to pay for the cost of Ms. Harnois' care.  Alternatively, Rockingham claims in Count II of its Verified Complaint that the Trust would be unjustly enriched if it were permitted to retain beneficial ownership of the Property.  Therefore, it asserts that if the transfer is not set aside as fraudulent, the Property should be held in a constructive trust for the purpose of paying Ms. Harnois' debt to the plaintiff.

The matter is before the court on the "Plaintiff's Motion for Summary Judgment" (Docket No. 29) by which Rockingham is seeking summary judgment on Count I of the complaint to the extent it alleges constructive fraud.  Thus, Rockingham is not seeking summary judgment on its claim in Count I that the transfer of Ms. Harnois' Property was carried out with actual intent to hinder or delay future creditors, or on its claim in Count II for unjust enrichment.  Rather, by this motion, Rockingham is claiming that it is entitled to judgment as a matter of law on its claim in Count I that at the time of the transfer, Ms. Harnois  believed or reasonably should have believed that she would incur debts beyond her ability to pay.

The matter is also before the court on the "Defendant's Motion for Leave to File First Amended Answer and Affirmative Defenses to Plaintiff's Verified Complaint" (Docket No. 61) by which the defendant is seeking to amend his Answer in order to assert a statute of limitations defense.  This defense is applicable only to Rockingham's claim of constructive fraud.  Although the defendant's motion to amend was not filed until after the plaintiff had moved for summary judgment, the defendant contends that his defense is meritorious, that Rockingham will suffer no unfair prejudice if the motion is allowed, and that justice would best be served by permitting the defendant to raise a defense, which he neglected to assert in his original Answer due to mere oversight, inadvertence and excusable neglect.

For all the reasons detailed herein, this court finds that there was good cause for the defendant's delay in seeking to amend his Answer under the circumstances presented in this case, and that there will be no unfair prejudice to the plaintiff by allowing the defendant to amend at this stage in the proceedings.  This court also finds that the proposed amendment has merit, and that the statute of limitations bars the plaintiff's claim for fraudulent transfer based on a theory of constructive fraud.   Therefore, justice requires that the defendant's motion for leave to amend his Answer be ALLOWED. Because this court finds that Count I is time-barred to the extent it alleges constructive fraud, the plaintiff's motion for summary judgment on that claim is DENIED.

## II.  <u>STATEMENT OF FACTS</u>[1]

The following facts are undisputed unless otherwise indicated.

### <u>The Parties</u>

The plaintiff, Rockingham, is a certified nursing care facility that is located in Rockingham County, New Hampshire and offers skilled and intermediate nursing care. (PF ¶ 1).  The facility, which is owned by the County, operates as a not-for-profit organization.  (<u>Id.</u>).  During the time period from April 14, 2009 until her death on September 14, 2013, Rockingham provided high quality nursing care to Beatrice Harnois at a cost of over $9,000 per month.  (<u>See id.</u> ¶¶ 2, 15).  It is undisputed that neither Ms. Harnois nor her family has ever paid for her care, which has cost over $460,000 in total. (<u>Id.</u> ¶ 16).

On July 27, 2006, Ms. Harnois created the Harnois Irrevocable Trust for the benefit of her children and grandchildren, naming her son, defendant Randolph Harnois ("Randolph"), and her daughter, Joyce Senno ("Joyce"), as trustees.  (PF ¶¶ 17, 19; DR ¶ 17).  As detailed below, Ms. Harnois had another son, Rodney, who was involved in her

---

[1]  Unless otherwise indicated, the facts are derived from the following materials: (1) the exhibits attached to the Plaintiffs' Motion for Summary Judgment (Docket No. 29) ("Pl. Ex. __"); (2) the Plaintiff's Statement of Facts Pursuant to Local Rule 56.1 (Docket No. 31) ("PF"); (3) the Affidavit of Steven E. Woods (Docket No. 32) ("Woods Aff."); (4) the Defendant's Response to Plaintiff's Statement of Facts Pursuant to Local Rule 56.1 (Docket No. 42) ("DR"); (5) the Defendant's Additional Statement of Facts (Docket No. 41) ("DAF"); (6) the Affidavit of Randolph Harnois (Docket No. 44) ("Randolf Aff."); (7) the Affidavit of Rodney A. Harnois (Docket No. 45) ("Rodney Aff."); (8) the exhibits attached to the Affidavit of James P. Mitchell (Docket No. 46) ("Def. Ex. __"); and (9) the exhibits attached to the Supplemental Affidavit of James P. Mitchell (Docket No. 53) ("Def. Supp. Ex. __").

care but was not a Trustee of the Trust.  Joyce passed away in September 2008.

Thereafter, Randolph became the sole trustee of the Trust.  (Randolph Aff. ¶ 2).  By its

claims in this action, Rockingham is challenging Ms. Harnois' transfer of her home to the

Trust.

## Ms. Harnois' Use and Transfer of the Property

In 1984, Ms. Harnois became the sole owner of the Property, which is located in

West Barnstable, Massachusetts.  (PF ¶ 3).  The Property served as Ms. Harnois' primary

residence until the Spring of 2008, when Ms. Harnois moved to New Hampshire to live

with her son, Rodney Harnois ("Rodney").  (See DAF ¶¶ 10-11; Rodney Aff. ¶ 4).

Ms. Harnois turned 80 years old in 2000.  (PF ¶ 3).  By that time, Ms. Harnois had

become unable to drive due to loss of vision.  (PF ¶ 6; DR ¶ 6).  Additionally, after 2000,

Ms. Harnois' sole source of income was social security, and she had to rely on financial

assistance from Joyce and Randolph in order to meet her expenses.  (PF ¶ 5; see also

Randolph Aff. ¶ 5).  Nevertheless, it is undisputed that Ms. Harnois was able to live

independently in the Property with assistance from Joyce, who visited her mother almost

daily, drove her to regular doctors' appointments, and supplemented the meals that Ms.

Harnois received from Meals on Wheels.  (DAF ¶¶ 2-3).

In 2002 and 2003, Joyce and Randolph became concerned about the lack of any

financial planning for their mother, and in 2004, they sought advice from Stephen Jones,

a trusts and estates lawyer.  (Id. ¶ 4; Randolph Aff. ¶¶ 4, 6).  After consultations with

Attorney Jones, Joyce and Randolph determined that a transfer of Ms. Harnois' home into

an irrevocable trust would enable them to carry out their mother's goal of remaining in

her home, and also facilitate the sale of the Property if necessary.  (Randolph Aff. ¶ 6).

Accordingly, on July 27, 2006, Joyce, acting on behalf of Ms. Harnois under a power of

attorney, executed an indenture of trust creating the Harnois Irrevocable Trust, and a

Quitclaim Deed transferring the Property to Joyce and Randolph in their capacities as

trustees of the Trust.  (Id. ¶ 7; Pl. Ex. 11; Def. Ex. 2).  The Quitclaim Deed, which was

recorded in the Barnstable Registry of Deeds on November 27, 2006, provides that the

Trust paid consideration of $1.00 in exchange for the Property.[2]  (Def. Ex. 2 at 1).  There

is no dispute that the transfer of the Property, which was assessed as having a value of

$332,100 in 2012, conveyed substantially all of Ms. Harnois' assets to the Trust.  (PF

¶¶ 22-23).  However, Ms. Harnois continued to live in the Property through most of 2008.

---

[2] In support of its motion for summary judgment on its constructive fraud claim, Rockingham argues that Ms. Harnois did not receive reasonably equivalent value for her Property because she received no more than nominal consideration in exchange for the transfer to the Trust.  (See Pl. Reply to S.J. (Docket No. 51) at 2).  However, the defendant disputes that the Trust provided no more than nominal consideration.  (DR ¶ 21).  He contends that both he and Joyce provided additional consideration, in the form of financial support, which enabled their mother to maintain her home and to pay for her personal living expenses in excess of her social security benefits.  (Id.; Randolph Aff. ¶ 6).  Rockingham responds that Randolph's effort to establish disputed facts on this issue is improper because his assertion that the Trust provided anything more than $1.00 in consideration for the transfer directly contradicts his deposition testimony.  (Pl. Reply to S.J. at 2).  Because this court finds that the plaintiff's claim for constructive fraud is barred by the statute of limitations, it is unnecessary to determine whether the defendant has raised a genuine dispute as to whether Ms. Harnois received reasonably equivalent value in exchange for the transfer of her Property in the context of the summary judgment analysis.  Accordingly, this matter will not be addressed further at this time.  The circumstances surrounding the transfer of the Property do, however, remain a viable issue for trial.

Although Ms. Harnois' health was declining steadily as a result of her age, at the time of the transfer in 2006, she was continuing to live independently with the help of her daughter.  (DR ¶ 6; Randolph Aff. ¶ 9).  According to Randolph, Ms. Harnois also remained generally conversant, had a very good memory for current events, and did not appear to be suffering from any type of dementia.  (Randolph Aff. ¶ 9).  Moreover, up until that point, there had been no discussions about the possibility of putting Ms. Harnois into a nursing home, as any such discussions would have been inconsistent with Ms. Harnois' wishes to remain in her home indefinitely.  (Id.).

### Ms. Harnois' Deteriorating Health

It is undisputed that by the spring of 2008, Ms. Harnois' physical and mental condition had deteriorated noticeably.  (DAF ¶ 9).  On April 1, 2008, Elder Services of Cape Cod and the Islands ("Elder Services") received a report indicating that Ms. Harnois appeared very confused and had been found wandering alone in her neighborhood, which was located on a busy road.  (Pl. Ex. 6 at 1).  Subsequently, a caseworker from Elder Services visited Ms. Harnois' home and found her to have "significant cognitive deficits." (Id.).  The caseworker also discovered various signs of self-neglect, including but not limited to, rotten food, a lack of personal care items, and no working smoke detectors in the home.  (Id. at 1-2; PF ¶ 9).  Accordingly, in July 2008, Elder Services filed a petition in the Barnstable Probate and Family Court seeking a guardianship over Ms. Harnois due to her inability to care for herself.  (PF ¶ 7).  On August 4, 2008, the Court determined that Ms. Harnois was unable to properly care for herself or to make informed decisions

7

regarding herself or her estate, and it entered a Temporary Decree of Guardianship appointing Randolph and Rodney as temporary guardians over their mother.  (Pl. Ex. 7 at 1-3).

At the time it was determined that Ms. Harnois was unable to care for herself, Joyce's health also was worsening.  (See DAF ¶ 10).  Because Randolph was unable to provide the necessary daily care for his mother while she lived at the Property, Ms. Harnois' children decided to move their mother to New Hampshire to live with Rodney. (Id. ¶¶ 10-11).  According to the defendant, at the time she moved into Rodney's home in late 2008, Ms. Harnois was mobile, remained in reasonably good health, and was caring for herself "for the most part[.]"  (Id. ¶ 12).  However, after the expiration of the temporary guardianship order from the Barnstable Probate and Family Court, Rodney filed a new petition for guardianship in the Rockingham County Probate Court.  (Pl. Ex. 8).  On February 10, 2009, that court issued an order in which it found, among other things, that Ms. Harnois was "incapacitated," that a guardian was necessary in order to provide for her continuing care, and that Ms. Harnois was incapable of making decisions on her own, including decisions about whether to consent to medical treatment and decisions regarding her property.  (PF ¶ 12; see also Pl. Ex. 8 at 1).

### Ms. Harnois' Admission to Rockingham

By the spring of 2009, Randolph and Rodney decided that it was necessary to admit Ms. Harnois to a nursing home on a permanent basis, and on April 14, 2009, she was admitted to Rockingham.  (Randolph Aff. ¶ 19; PF ¶ 2).  Ms. Harnois was 88 years

8

old at the time of her admission, and she had a number of health problems, including a history of dementia, a history of stroke, a permanent pacemaker, hypertension, hyper-lipidemia, and poor vision due to macular degeneration.  (PF ¶¶ 13-14).  Nevertheless, she remained capable of walking, retained good strength in all of her extremities, was able to answer questions and feed herself, and displayed appropriate behavior and a fairly cheerful mood.  (DAF ¶ 16).

Throughout the time period Ms. Harnois resided at Rockingham, the monthly expenses for her care exceeded $9,000.  (PF ¶ 15).  As described above, neither Ms. Harnois nor her family has ever paid for her care, even though they agreed to do so upon her admission to the facility.  (Id. ¶ 16; Woods Aff. ¶ 3).  At some point, Randolph and Rodney filed a Medicaid application with the State of New Hampshire on their mother's behalf, and it appeared that she would qualify for assistance.  (DAF ¶ 15; Woods Aff. ¶ 6). However, Ms. Harnois' Medicaid application was denied, both initially and again on appeal.  (DAF ¶ 15).  Consequently, Rockingham has never received payment from any source.

**Procedural History**

On June 14, 2011, Rockingham filed its Verified Complaint asserting claims against the defendant for fraudulent transfer and constructive trust.  (Docket No. 1). Following an initial scheduling conference, this court issued a Scheduling Order in which it established October 20, 2011 as the deadline for any motions for leave to amend the pleadings, December 13, 2011 as the deadline for the completion of fact discovery, and

9

January 20, 2012 as the deadline for the filing of any motions for summary judgment.
(Docket No. 10).   However, on December 1, 2011, the parties filed a joint motion to
amend the scheduling order in which they sought to extend the remaining pretrial
deadlines for a period of 90 days.   (Docket No. 11).   In support of their motion, the
parties explained that they had been "engaged in settlement negotiations for some time,"
and believed they were close to resolving the case.   (Id. ¶ 2).   They further stated that
they "wish[ed] to focus their time and resources on finalizing the . . . settlement" and to
"avoid the cost of engaging in unnecessary discovery."   (Id. ¶ 3).   Accordingly, this court
allowed the motion, thereby extending the pretrial deadlines for approximately three
months.   (Docket Entry dated 12/02/2011).

      The record shows that while the parties ultimately were unable to reach a final
settlement, they continued to focus their efforts on settling the case throughout 2012 and
into 2013.   Thus, on March 9, 2012, the parties notified the court that they had continued
to engage in settlement negotiations, and that they were in the process of reviewing a
written settlement proposal.   (Docket No. 12).   They also stated that the final terms of the
proposed settlement were dependent upon the defendant obtaining financing, "which
Defendant has been diligently pursuing for several months."   (Id. ¶ 2).   Additionally, the
parties informed the court that because they had "focused their time and resources on
finalizing the . . . settlement[,]" they intended to seek another 90-day extension of the
remaining pretrial deadlines so that they would be able to complete discovery in the event
they failed to resolve the litigation within 30 days.   (Id. ¶ 3).   Based on the parties'

representations, this court issued a new Scheduling Order in which it set June 11, 2012 as the deadline to complete fact discovery and July 18, 2012 as the deadline for filing any motions for summary judgment. (Docket No. 13).

Although the parties encountered complications that prevented them from reaching a settlement in the spring of 2012, they continued to pursue settlement while at the same time engaging in fact discovery. (See Docket Nos. 14, 16). Thus, the parties reported that as of September 5, 2012, the defendant was continuing to seek financing that would enable the parties to resolve the dispute. (Docket No. 16 ¶ 2). Additionally, the parties were hopeful that the defendant would receive a favorable decision on appeal from the denial of Ms. Harnois' application for long-term Medicaid benefits, and that the outcome of the appeal would provide them with an alternative means of settling the litigation. (Id. ¶ 3). Following a status conference held on September 6, 2012, this court ordered the parties to complete fact discovery by October 15, 2012. (Docket Order dated 09/06/2012). Any motions for summary judgment were to be filed by November 19, 2012. (Id.).

Thereafter, the parties filed four additional joint motions seeking to extend the deadline for the filing of summary judgment motions. (See Docket Nos. 18, 21, 23, 26). As explained in their most recent joint motion dated March 15, 2013, "[t]he Parties have not pursued discovery aggressively in the past due to the prospect of potential settlement." (Docket No. 26 ¶ 4). Consequently, as of March 15, 2013, they were still in the process of completing some limited fact discovery. (Id. ¶¶ 3-4). They also were

11

continuing to await the outcome of Ms. Harnois' appeal from the denial of Medicaid benefits, and remained hopeful that a favorable decision would lead to the resolution of the case.  (Id. ¶ 2).  Accordingly, on March 19, 2013, this court allowed the motion and extended the summary judgment deadline to June 19, 2013.  (Docket Entry dated 03/18/2013).

The plaintiff filed its present motion for summary judgment on June 19, 2013. (Docket No. 29).  Briefing took place over an extended period of time due in large part to the parties' continued efforts to reach a settlement.  Thus, on July 2, 2013, the defendant filed an assented-to motion to extend the time to respond to the plaintiff's motion in which he informed the court that the parties' settlement discussions were continuing and that he needed more time to review recently produced documents.  (Docket No. 34).  He subsequently filed two additional assented-to motions in which he stated that "[d]ue to the ongoing nature of the settlement negotiations, the parties believe that it would be in their best interest to extend the time for the Defendant to file the Response to the Summary Judgment Motion . . . so that the settlement negotiations can be completed and the case resolved with an agreement for judgment."  (Docket No. 36 ¶ 6; Docket No. 38 ¶ 7).  Based on these representations, this court gave the defendant until September 17, 2013 to respond to the motion for summary judgment.  (Docket Entry dated 08/13/2013).

Despite their efforts, the parties were unable to reach a settlement, and on September 17, 2013, the defendant filed an opposition to the plaintiff's motion for summary judgment.  (Docket No. 40).  On November 14, 2013, following a hearing on

the plaintiff's summary judgment motion, the defendant filed his present motion for leave to file an amended Answer.  (Docket No. 61).

### III.  ANALYSIS – DEFENDANT'S MOTION TO AMEND

The defendant has moved for leave to amend his Answer in order to state an affirmative defense based on the statute of limitations.  The defendant explains that his failure to raise this defense previously was due to the "oversight, inadvertence and excusable neglect" of his counsel.  (Def. Mot. (Docket No. 61) ¶ 4; Def. Mem. (Docket No. 62) at 2).  He further contends that his motion should be allowed because his proposed defense has merit, and because allowance of the motion will cause no delay in the trial of this case or unfairly prejudice the plaintiff.  (Def. Mot. ¶ 2; Def. Mem. at 2-3).  For the reasons that follow, this court finds that the defendant's delay in seeking to amend his Answer is excusable in light of the parties' significant focus on settling the litigation, and that justice would best be served if the defendant's motion to amend were allowed.

#### A.    Standard of Review

Rule 15(a) of the Federal Rules of Civil procedure provides that "[a] party may amend its pleading once as a matter of course within . . . 21 days after serving it[.]"  Fed. R. Civ. P. 15(a)(1).  Thereafter, a party must obtain leave of court.  See Fed. R. Civ. P. 15(a)(2).  The decision whether to grant a motion for leave to amend falls within the trial court's discretion.  Sheehan v. City of Gloucester, 321 F.3d 21, 26 (1st Cir. 2003).  Pursuant to Rule 15(a)(2), "[t]he court should freely give leave [to amend] when justice

so requires." Fed. R. Civ. P. 15(a).  Accordingly, under the liberal amendment policy

underlying Rule 15, leave to amend "is freely given when justice so requires absent an

adequate basis to deny amendment such as futility, bad faith, undue delay or a dilatory

motive."  <u>Transwitch Corp. v. Galazar Networks, Inc.</u>, 377 F. Supp. 2d 284, 290 (D.

Mass. 2005) (quotations and citation omitted).

  As the plaintiff points out, however, where, as in this case, the court has issued a

scheduling order establishing pretrial deadlines pursuant to Fed. R. Civ. P. 16(b), "[t]hose

deadlines may be modified 'only for good cause and with the judge's consent.'"

<u>Somascan, Inc. v. Philips Med. Sys. Nederland, B.V.</u>, 714 F. 3d 62, 64 (1st Cir. 2013)

(quoting Fed. R. Civ. 16(b)(4)).  As a result, "'Rule 16(b)'s good cause standard, rather

than Rule 15(a)'s freely give[n] standard, governs motions to amend filed after

scheduling order deadlines' have passed."  <u>Id.</u> (quoting <u>Flores-Silva v. McClintock-</u>

<u>Hernandez</u>, 710 F.3d 1, 3 (1st Cir. 2013)) (additional quotations omitted).  "Unlike Rule

15(a)'s 'freely given' standard, which focuses mostly on the bad faith of the moving party

and the prejudice to the opposing party, Rule 16(b)'s 'good cause' standard emphasizes

the diligence of the party seeking the amendment."  <u>O'Connell v. Hyatt Hotels of P.R.</u>,

357 F. 3d 152, 155 (1st Cir. 2004) (internal citations omitted).  Thus, "[p]rejudice to the

opposing party remains relevant but is not the dominant criterion."  <u>Id.</u>

  **B.**  <u>**Application**</u>

<u>**Good Cause**</u>

Rockingham argues that the defendant's motion to amend should be denied because Randolph did not move to amend his Answer for more than two years after the October 20, 2011 deadline for doing so had passed, and because he has failed to articulate any good cause for his delay.  (Pl. Opp. Mem. (Docket No. 65) at 3-5).  As described above, the defendant has explained that his failure to raise a statute of limitations defense earlier was due to the oversight and inadvertence of his counsel.  (Def. Mot. ¶ 4; Def. Mem. at 2).  Even if this explanation is not sufficient to justify the delay in moving to amend, this court finds that there was good cause for the defendant's conduct, and that he acted with sufficient diligence in light of the extensive settlement efforts in which the parties have been engaged.

The record establishes that throughout most if not all of the pendency of this lawsuit, the parties were engaged in negotiations aimed at settling the case.  As described above, the parties repeatedly informed the court that they were focusing their efforts on finalizing a settlement, and that they wished to devote their time and resources toward settlement negotiations rather than litigation.  Thus, there was no reason to seek to amend the answer to assert the statute of limitations defense.  Furthermore, the parties reported that throughout most of the pre-summary judgment period, Randolph had been working diligently to obtain financing to cover the cost of his mother's care, and had been pursuing the Medicaid appeal in an effort to obtain funds to pay Rockingham.  The defendant should not be faulted for not raising a defense which would enable him to avoid liability on at least one cause of action while working diligently to find funds to

15

satisfy Rockingham's claim.  It was not until after Rockingham moved for summary judg-

ment and the parties' settlement efforts failed that the defendant appropriately focused on

the merits of the legal dispute and devoted resources to responding to the legal claims

raised.  Given the parties' significant focus on achieving a mutually agreeable settlement

rather than on the pursuit of their legal dispute, this court finds that there was good cause

for the defendant's delay in seeking to amend his Answer, and that he acted with

sufficient diligence under the unique circumstances presented here.

## **Unfair Prejudice**

This court also finds that Rockingham will suffer no unfair prejudice if Randolph

is allowed to amend.  The defendant wishes to assert his proposed statute of limitations

defense pursuant to Mass. Gen. Laws ch. 109A, § 10(b), which extinguishes claims for

fraudulent transfer based on a theory of constructive fraud "unless action is brought . . .

within four years after the transfer was made or the obligation was incurred[.]"  The facts

relevant to the statute of limitations analysis are not in dispute, and, in fact, have been

known to the parties since the onset of this litigation.  The allowance of the defendant's

motion will not result in the need for additional discovery or cause delay in the trial of

this matter.  Compare Acosta-Mestre v. Hilton Int'l of P.R., 156 F.3d 49, 52 (1st Cir.

1998) (affirming denial of motion for leave to amend complaint where amendment

"would have resulted in at least an additional four months of discovery and would have

delayed trial by at least an additional twelve months[,]" thereby causing prejudice to the

defendant).  If anything, Randolph's ability to assert this defense will help focus the issues remaining for trial.

The plaintiff contends that an amendment will cause unfair prejudice because it will materially alter the parties' trial strategy.  (Pl. Opp. Mem. at 5-6).  However, the record does not support this assertion. While a statute of limitations defense may defeat Rockingham's claim for constructive fraud, it does not otherwise impact the claims or the evidence that Rockingham must present at trial.  As the plaintiff has stated in its opposition to the motion to amend:

> Even if the amendment was allowed and the Court determined that the statute of limitations barred the constructive fraud claim, a determination which Rockingham believes would be in error, the case would still have to be tried on the actual fraud count which, essentially, will include the same evidence regardless of whether the constructive fraud count survives summary judgment.

(Id. at 7).  Therefore, allowance of the amendment will impose no additional burdens on the plaintiff.

Nevertheless, the plaintiff argues that the defendant's delay in moving to amend is extremely prejudicial because it somehow deceived Rockingham into believing that there would be assets available to pay for Ms. Harnois' care.  Specifically, the plaintiff reasons as follows:

> Assuming, *arguendo*, that defendant's interpretation of M.G.L. c. 109A, § 10 is correct, the proper mechanism for raising this issue would have been to file a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  Had defendant done this, Rockingham would have known there were no assets to pay for Ms. Harnois' care and it could have evicted her as early as the Summer of 2011.  See Affidavit of

17

Steven Woods.[3]  It could have offered whatever assistance it could to Ms. Harnois on the Medicare dispute or attempt to intervene in that process.  Instead, defendant intentionally allowed this litigation to languish while his mother received free care.  Time and time again, defendant expressed a willingness to sell the Property to pay for at least part of the debt owed to Rockingham knowing full well that, in the interim, Rockingham continued to incur costs to care for his mother.  It was only after her death and when faced with a summary judgment motion, that defendant belatedly raised his statute of limitations defense.  Defendant received a wrongful benefit by failing to disclose his statute of limitations defense for more than two years.

(Id.).

Rockingham's argument does not demonstrate unfair prejudice.  Whether or not Rockingham's claim for constructive fraud was time-barred by the time it filed suit in 2011 does not alter the fact that the Property was not in Ms. Harnois' name when she entered Rockingham, or any time thereafter.  Thus, it is not persuasive based on the present record that Rockingham relied on the Property when it decided to admit Ms. Harnois; rather, it appears that Rockingham was relying on Ms. Harnois' Medicaid application.  See note 3, supra.  In any event, if representations were made after suit was filed on which Rockingham relied in deciding not to evict Ms. Harnois, those representations are not relevant to whether the suit raised a timely claim of constructive fraud.  Such

---

[3]  The Affidavit of Steven Woods describes, among other things, the costs associated with Ms. Harnois' care while she resided at Rockingham.  However, it does not support Rockingham's claim that it would have known, by the summer of 2011, that there were no assets available to pay for that care.  According to Mr. Woods, "Ms. Harnois had applied for Medicaid assistance and it appeared, at least initially, that she would qualify for Medicaid."  (Woods Aff. ¶ 6).  It was not until April 2013 when "Rockingham learned that her appeal challenging the denial of benefits was also denied."  (Id. ¶ 7).  Therefore, Mr. Woods' statements indicate that the parties remained hopeful, at least until April 2013, that funds would be available to pay for Ms. Harnois' care.

post-litigation representations are no more or less enforceable depending on whether the constructive fraud claim was timely filed.  Since the statute of limitations defense does not relate to all of Rockingham's claims, it cannot be found that Rockingham is unduly prejudiced by not being able to pursue an untimely claim.

Moreover, Rockingham's argument is based on an unsupportable premise.  The defendant was not obligated to file a motion to dismiss, and it is far from clear that he would have chosen to devote any time or resources to such a motion in light of the parties' focus on settlement and the fact that a motion to dismiss the constructive fraud claim based on the statute of limitations would not have disposed of Rockingham's claims for constructive trust and fraudulent transfer based on a theory of actual fraud. Furthermore, there is no merit to the plaintiff's argument that the defendant's earlier assertion of a statute of limitations defense would have alerted it to the fact that there were no assets to pay for Ms. Harnois' care.  The entire premise of Rockingham's lawsuit is that the Property was allegedly fraudulently conveyed before Ms. Harnois entered Rockingham and began incurring costs for her care.  There is nothing in the record to suggest that Rockingham would have litigated its case any differently if Randolph had included a statute of limitations defense in his Answer or had moved to amend within the time period set forth in this court's initial Scheduling Order. Finally, the fact that the defendant may have expressed a willingness to sell the Property during the parties' settle-ment negotiations does not foreclose him from raising appropriate legal defenses in the

context of litigation.  Therefore, this court finds that Rockingham has not been prejudiced

by the defendant's delay in moving to amend his Answer.

### Interests of Justice and Judicial Economy

This court also finds that there is no merit to Rockingham's argument that the

interests of justice and judicial economy would best be served by the denial of the motion

to amend.  (See Pl. Opp. Mem. at 7-8).  As described below, this court finds that the

defendant's proposed statute of limitations defense has merit, and disposes of Rocking-

ham's claim of constructive fraud.  Therefore, even if the defendant's ability to pursue its

statute of limitations defense will do little to alter the complexity of the case or the

evidence that will be introduced at trial, justice requires that the defendant be allowed to

amend his Answer.  See Martin v. Sands, 62 F. Supp. 2d 196, 199 (D. Mass. 1999)

(finding that justice required that defendants be allowed to amend where proposed

amendment was supported by the evidence).

This court's conclusion is not altered by the plaintiff's argument that "denial of the

motion would support the strong public policy in favor of ensuring the payment of

nursing home costs for the elderly which is embodied in our statutes."  (Pl. Opp. Mem. at

7-8).  First of all, allowing the defendant to assert a statute of limitations defense will not

prevent Rockingham from pursuing its surviving claims at trial.  Secondly, the claim

either was or was not timely asserted by Rockingham.  There is no public policy issue

involved in whether the plaintiff can belatedly assert claims.  Finally, "[t]he Federal

Rules reject the approach that pleading is a game of skill in which one misstep by counsel

may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." Foman v. Davis, 371 U.S. 178, 181-82, 83 S. Ct. 227, 230, 9 L. Ed. 2d 222 (1962) (quoting Conley v. Gibson, 355 U.S. 41, 48, 78 S. Ct. 99, 103, 2 L. Ed. 2d 80 (1957)). Accordingly, the policies embodied in the Federal Rules would best be served by allowing the defendant's motion.

## Futility

Finally, Rockingham argues that leave to amend should be denied because the defendant's proposed statute of limitations defense is futile. The "futility" assessment is governed by the standard for motions to dismiss under Fed. R. Civ. P. 12(b)(6). See Transwitch Corp., 377 F. Supp. 2d at 290. Therefore, an amendment will not be deemed futile unless it fails to support a "plausible entitlement to relief." Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559, 127 S. Ct. 1955, 1967, 167 L. Ed. 2d 929 (2007)). In the instant case, this court finds that Rockingham's claim for fraudulent transfer based on constructive fraud is time-barred under the applicable statute of limitations. Accordingly, the defendant's proposed amendment states a claim for relief and is not futile.

## The Applicable Statute of Limitations

Rockingham has brought its claims for fraudulent transfer under the Massachusetts Uniform Fraudulent Transfers Act, Mass. Gen. Laws ch. 109A, §§ 1, et seq. ("UFTA"), which provides in relevant part:

>  (a)  A transfer made or obligation incurred by a debtor is fraudulent
>  as to a creditor, whether the creditor's claim arose before or after the
>  transfer was made or the obligation was incurred, if the debtor made
>  the transfer or incurred the obligation:
>
>>  (1)  with actual intent to hinder, delay, or defraud any creditor
>>  of the debtor; or
>>
>>  (2)  without receiving a reasonably equivalent value in ex-
>>  change for the transfer or obligation, and the debtor ... (ii)
>>  intended to incur, or believed or reasonably should have
>>  believed that he would incur, debts beyond his ability to pay
>>  as they became due.

Mass. Gen Laws ch. 109A, § 5(a).  Thus, Section 5 of the UFTA makes a transfer or

obligation fraudulent as to both present and future creditors "if there is actual intent to

hinder, delay or defraud."  Norwood Coop. Bank v. Gibbs, Civil Action No. 10-11647-

JCB, 2012 WL 4094328, at *6 (D. Mass. Sept. 13, 2012).  It also makes certain transfers

and obligations fraudulent, "regardless of the ability to prove actual intent[,]" where there

is "constructive fraud[.]"  Id.

Section 10 of the UFTA, entitled "Limitation of actions," establishes one- and

four-year periods of limitations on actions brought under Section 5.  It provides in

relevant part as follows:

>  A cause of action with respect to a fraudulent transfer or obligation
>  under this chapter shall be extinguished unless action is brought:
>
>  (a)  under paragraph (1) of subsection (a) of section five, within four
>  years after the transfer was made or the obligation was incurred or, if
>  later, within one year after the transfer or obligation was or could
>  reasonably have been discovered by the claimant;
>
>  (b)  under paragraph (2) of subsection (a) of section five ... within
>  four years after the transfer was made or the obligation was incurred
>  ....

Mass. Gen. Laws. ch. 109A, § 10.  Accordingly, fraudulent transfer claims based on the debtor's actual intent to defraud must be brought within four years following the transfer or obligation, or within one year after such transfer or obligation was discovered or could reasonably have been discovered by the claimant.  However, claims based on constructive fraud must be brought "within four years after the transfer was made or the obligation was incurred[,]" regardless of the claimant's knowledge or ability to discover the challenged transaction.  Id.

## Untimeliness of Rockingham's Claim

The undisputed facts presented in this case show that the transfer of Ms. Harnois' Property to the Trust occurred, at the latest, in November 2006 when the Quitclaim Deed to the Property was recorded in the Barnstable Registry of Deeds.  (See Def. Ex. 2).  Because Rockingham did not initiate this action until June 14, 2011, more than four years after the allegedly fraudulent transaction occurred, the plaintiff's claim for constructive fraud is barred under Section 10(b) of the Massachusetts UFTA.

The plaintiff does not dispute that the transfer of the Property occurred more than four years prior to the start of the litigation.  Nevertheless, it argues that the action is timely.  According to Rockingham, the limitations period set forth in the UFTA "runs from the later of either a 'transfer' or an 'obligation.'"  (Pl. Opp. Mem. at 8).  It further asserts that because "the underlying 'obligation' (Ms. Harnois' care) did not commence until April 14, 2009[,]" the date when Ms. Harnois was admitted to Rockingham on a

permanent basis, the action was commenced "well within the applicable four year statute

of limitations."  (Id.).

This court finds that Rockingham's reading of the term "obligation" to mean "Ms.

Harnois' care" reflects a misinterpretation of the limitations provision, and is inconsistent

with the manner in which "obligation" is used throughout the UFTA.  Where a court is

called upon to interpret a statute, it must "look first to the plain meaning of the statutory

language.  Where the language is clear and unambiguous, it is to be given its 'ordinary

meaning.'"  Commonwealth v. Mogelinski, 466 Mass. 627, --- N.E. 2d ---, 2013 WL

6697770, at *4 (Dec. 23, 2013) (quoting Commonwealth v. Brown, 431 Mass. 772, 775,

730 N.E.2d 297 (2000)) (internal citations omitted).  "Of course, this meaning must be

reasonable and supported by the purpose and history of the statute."  Id. (quoting Wright

v. Collector & Treas. of Arlington, 422 Mass. 455, 457-58, 663 N.E.2d 572 (1996)).

Moreover, the court must "look to the language of the entire statute, not just a single

sentence, and attempt to interpret all of its terms 'harmoniously to effectuate the intent of

the Legislature.'"  Id. at *9 (quoting Commonwealth v. Hanson H., 464 Mass. 807, 810,

985 N.E.2d 1179 (2013)).

Although the term "obligation" is not defined in the UFTA, the plain language of

the term, as used in Section 10 and throughout the statute, refers to the transaction that is

being challenged as fraudulent, and not, as Rockingham argues, to the financial obligation

for which the claimant is seeking compensation.  Thus, Section 10 of the statute estab-

lishes limitations periods for causes of action brought under Section 5.  See Mass. Gen.

Laws ch. 109A, § 10(a)-(b).  As described above, Section 5 defines when "[a] transfer made *or obligation incurred by a debtor is fraudulent as to a creditor*[.]"  Mass. Gen. Laws ch. 109A, § 5(a) (emphasis added).  As it pertains to actions for constructive fraud, Section 5 requires the claimant to establish, <u>inter alia</u>, that "the debtor made the transfer or *incurred the obligation* . . . without receiving a reasonably equivalent value in exchange for the transfer or obligation[.]"  <u>Id.</u> § 5(a)(2) (emphasis added).  Therefore, under the plain language of the statute, the term "obligation" refers to a fraudulent transaction that was made by the debtor and occurred without receiving reasonably equivalent value in exchange.  It does not refer to the debt owed to the claimant, for which the claimant is seeking compensation in the litigation.  In this case, the transaction that Rockingham challenges as fraudulent was the transfer of the Property that took place in 2006.  Under Section 10(b) of the UFTA, its claim for constructive fraud based on that transaction is time-barred.

This court's interpretation of the term "obligation," as used in Sections 5 and 10 of the statute, is consistent with the use of that term in other provisions of the UFTA.  For example, Section 6 of the statute, which addresses situations in which a creditor's claim arose before the alleged fraudulent transfer or obligation, provides in relevant part that

> [a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

25

Mass. Gen. Laws ch. 109A, § 6.  As in the case of Section 5, Section 6 defines when an "obligation incurred by a debtor is fraudulent as to a creditor[.]"  Therefore, the term "obligation" pertains to the alleged unlawful transaction and not to some other obligation for which the claimant is attempting to recover.

The remedies provisions of the UFTA, which can be found at Section 8 of the statute, further confirm this interpretation.  Thus, Section 8 provides in significant part that "[i]n an action for relief against a transfer or obligation under this chapter, a creditor . . . may obtain . . . avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim[.]"  Mass. Gen. Laws ch. 109A, § 8.  Accordingly, Section 8 further demonstrates that the term "obligation" refers to the challenged transaction under-taken by the debtor, which the plaintiff contends is fraudulent.  Indeed, by its claims in this action, Rockingham is seeking to set aside the transfer of the Property to the Trust, pursuant to Section 8, so that it can be sold in order to pay for Ms. Harnois' nursing home care.  (See Pl. S.J. Mem. (Docket No. 30) at 10).  It is not challenging Ms. Harnois' care or the defendant's obligation to pay for that care.

Rockingham's reliance on Grassmueck v. Bensky, N. C04-2016P, 2005 WL 1076533 (W.D. Wash. May 5, 2005), does not support an alternative conclusion.  In that case, the court considered the parties' arguments as to whether the statute of limitations barred a fraudulent conveyance claim challenging an agreement to purchase all of the assets of a company for $3.3 million.  Grassmueck, 2005 WL 1076533, at *1.  The purchase agreement, which was assigned to the plaintiff, was carried out through a series of transfers to the defendant, who was the president and controlling member of the

company. Id.  The plaintiff claimed that the company was significantly overvalued, and that it received virtually nothing in return for its purchase.  Id.  At issue was whether the statute of limitations began to run when the purchase agreement was signed or when the fraudulent transfers effectuating the purchase agreement were consummated.

As in the case of the Massachusetts UFTA, the limitations provision at issue in Grassmueck provided that "a cause of action is extinguished unless the action is brought 'within four years after the transfer was made *or* the obligation was incurred ...'"  Id. at *3 (quoting RCW 19.40.091(a) and (b)) (emphasis in original).  Based on the provision's use of disjunctive language, the court rejected the defendant's proposed reading of the statute, "that requires the clock to start running from the earliest possible date, which in this case would be the date the obligation was incurred."  Id.  Instead, the court agreed with the plaintiff's argument "that the four-year period should be calculated from the latest possible date, which would be the transfer of funds" that occurred approximately one month after the date of the agreement.  Id.  Accordingly, the court found that the plaintiff's position was consistent with the statute's plain language.  See id.

Nothing in Grassmueck undermines this court's interpretation of the term "obligation," as used in Mass. Gen. Laws ch. 109A, § 10.  In that case, both the obligation to purchase the company, and the transfers made by the debtor in order to carry out that obligation, were part of a single transaction, which the plaintiff alleged was fraudulent.  Therefore, although the Grassmueck court confirmed that the limitations period begins to run *either* at the time the challenged transfer was made *or* at the time the challenged obligation was incurred, it does not support Rockingham's reading of

27

"obligation" as something other than the alleged fraudulent transaction.  Rather, it provides further support for this court's conclusion that an "obligation," as used in the limitations provision, refers to the challenged transaction, which the claimant is seeking to set aside.  Therefore, the defendant's proposed statute of limitations defense is not futile, and his motion to amend his Answer is allowed.

## IV.   ANALYSIS – PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Rockingham has filed a motion for summary judgment, pursuant to Fed. R. Civ. P. 56(a), by which it is seeking judgment as a matter of law on its claim for fraudulent transfer based on a theory of constructive fraud.  In ruling on a motion for summary judgment, the facts must be viewed in the light most favorable to the non-moving party. See Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008).  Summary judgment is appropriate where the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a), (c); Soc'y of the Holy Transfiguration Monastery, Inc. v. Gregory, 689 F. 3d 29, 39 (1st Cir. 2012).  "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'"  Vineberg, 548 F.3d at 56 (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)).  "A fact is material only if it possesses the capacity to sway the outcome of the litigation under the applicable law."  Id. (quotations, punctuation and

citations omitted).  In the instant case, as described above, the undisputed facts

demonstrate that the transfer giving rise to Rockingham's claim for constructive fraud

occurred more than four years before this action was filed.  Consequently, the claim for

constructive fraud is time-barred under Mass. Gen. Laws ch. 109A, § 10, and

Rockingham's motion for summary judgment must be denied.

## V.   <u>CONCLUSION</u>

For all the reasons described above, the "Defendant's Motion for Leave to File

First Amended Answer and Affirmative Defenses to Plaintiff's Verified Complaint"

(Docket No. 61) is ALLOWED.  The defendant shall file an amended Answer within **10**

**days** from the date of this Memorandum of Decision and Order.  The "Plaintiff's Motion

for Summary Judgment" (Docket No. 29) is DENIED.


                                                        / s / Judith Gail Dein
                                                Judith Gail Dein
                                                United States Magistrate Judge